IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

WILLARD SUMMERS,

    Plaintiff,

v.  No. 08-1268

McNAIRY COUNTY BOARD OF EDUCATION
and McNAIRY COUNTY, TENNESSEE,

    Defendants.

_____

ORDER GRANTING MOTION OF DEFENDANT McNAIRY COUNTY BOARD
OF EDUCATION FOR SUMMARY JUDGMENT AND DISMISSING CASE
_____

*INTRODUCTION AND BACKGROUND*

The Plaintiff, Willard Summers, initiated this action against the Defendants, McNairy County Board of Education (the "Board") and McNairy County, Tennessee, on October 31, 2008, alleging violation of the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 *et seq.* (ADEA), and the Tennessee Human Rights Act, Tennessee Code Annotated § 4-21-101 *et seq*. (THRA).  In an order entered February 11, 2009, the Plaintiff was granted a voluntary nonsuit without prejudice as to Defendant McNairy County, Tennessee.  Before the Court is the motion of the remaining Defendant, the Board, for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

*STANDARD OF REVIEW*

Rule 56 provides in pertinent part that a ". . . judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(c); *see* Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986); Canderm Pharmacal, Ltd. v. Elder Pharm., Inc., 862 F.2d 597, 601 (6th Cir. 1988). "The district court must construe the evidence and draw all reasonable inferences in favor of the nonmoving party." Am. Civil Liberties Union of Ky. v. Grayson County, Ky., 591 F.3d 837, 843 (6th Cir. 2010) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)). "The central issue is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" Ky. Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc., 588 F.3d 908, 915 (6th Cir. 2009) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)).

*FACTS*

The following facts are undisputed unless otherwise noted. Summers, born February 28, 1936, was seventy-two years old at the time the incidents occurred from which this lawsuit arose. (Dep. of Willard Summers ("Summers Dep.") at 8; Compl. ¶ 3.) The Board is a governmental entity responsible for oversight and control of the McNairy County, Tennessee school system. (Compl. ¶ 4.) Charles Miskelly was the Board's Director of Schools for the relevant time period. (Dep. of Charles Miskelly ("Miskelly Dep.") at 8.) Dr. Brian Jackson was the Principal of Adamsville Junior and Senior High School. (Dep. of Dr. Brian Jackson ("Jackson Dep.") at 18.)

In 1963, Summers was hired by Iuka High School in Iuka, Mississippi and placed in charge of the eleventh grade play. (Summers Dep. at 20-21.) He was asked to resign after two months of employment. (Summers Dep. at 20.) During that period, his class chose to perform the play 1984, which the Board claims was controversial. (Summers Dep. at 21.) According to Summers, he was

asked to resign because the play was perceived as "teaching communism" and the script contained "salacious" language.  (Summers Dep. at 21.)

The week after his resignation, Summers obtained a job teaching eleventh grade English in the Corinth, Mississippi City Schools.  (Summers Dep. at 23-24.)  His employment was terminated three weeks later after he encouraged his students to read the book Uhuru, the content of which was objected to as inappropriate by a group of parents and at least one teacher.[1]  (Summers Dep. at 24, 28.)  On his discharge, Plaintiff was told by the Corinth City Schools Director of School that, "I'm sorry.  We just can't use you.  It's too much controversy."  (Summers Dep. at 28.)

Summers subsequently taught in public schools in Florida until 1990 when he retired. (Summers Dep., Ex. 5.)  Thereafter, he occasionally worked as a substitute teacher.  (Summers Dep. at 52, 143.)  In 2006, the Plaintiff began substitute teaching in the Alcorn County, Corinth City and Chester County, Mississippi schools.  (Summers Dep. at 52.)  Summers understood that it was his job to follow the outline left by the regular teacher.  (Summers Dep. at 57.)  According to the Plaintiff, he must also, however, follow the interests of the students and respond to their questions even if they fall outside the subject being taught or discussed.  (Summers Dep. at 57.)

In late 2007 or early 2008 while working as a substitute in an eleventh grade science class at Kossuth High School on a lesson involving DNA, the Plaintiff discussed religion and evolution. (Summers Dep. at 58-59.)  Summers was aware that at least one student was particularly offended that he was teaching religion.  (Summers Dep. at 60.)  Following the incident, he was no longer called to substitute teach in the Alcorn County School System.  (Summers Dep. at 65.)  Summers

---

[1]According to the deposition, the book was about the Mau Mau tribe in Africa, which required its initiates to drink menstrual blood.  (Summers Dep. at 24.)

was told by the principal there was a complaint that he was teaching religion in the classroom and the principal "did not intend to have CNN in his school doing stories." (Summers Dep. at 65.)

The Plaintiff first learned of a teaching position with the Board from Jackson. (Summers Dep. at 120-21.) The two had lived in the same community and Jackson had known Summers his entire life. (Jackson Dep. at 44.) The Board avers that Jackson was aware the Plaintiff was involved in controversial matters. (Jackson Dep. at 47-48.) Jackson testified in his deposition that he was a student at Ramer Elementary School when Summers was employed there as a substitute teacher and personally witnessed allegedly "controversial" statements made by the Plaintiff in the classroom concerning religion and evolution. (Jackson Dep. at 50-51.) He could not recall what was allegedly said by Summers, however. (Jackson Dep. at 51.)

In February 2007, the Plaintiff applied for a teaching position with the Board. (Compl. ¶ 3.) He claims that, when he inquired about the position to Miskelly, he was asked for his age. Miskelly then asked how long he planned to teach, to which Summers replied, "[W]ell, I'd like to qualify in Tennessee retirement." (Summers Dep. at 113.) The Board denies that these questions were posed. Summers never had a formal interview with the Board, but met with Miskelly on three or four occasions regarding possible employment. (Summers Dep. at 132.)

According to the Board, when making hiring decisions, Miskelly reviews applications and, with the assistance of the principal, creates a list of candidates to be interviewed by the principal. (Miskelly Dep. at 28-32.) He considers several factors, including, but not limited to, the applicant's ability to exercise good judgment. (Miskelly Dep. at 33-34.) Once Jackson completes the interview process, he recommends the best candidate to Miskelly. (Miskelly Dep. at 32.)

In 2007, Jackson interviewed prospective candidates for the open position and made a

4

recommendation to Miskelly. (Miskelly Dep. at 35-36, 39.) Summers was not interviewed for the position, even though he claims he had more teaching experience than many of the other applicants. (Summers Dep. at 133; Miskelly Dep. at 44.) Jackson testified in his deposition that Summers was not interviewed because Miskelly did not feel he had the ability to exercise good judgment in the classroom. (Jackson Dep. at 33-34.) The Plaintiff claims that "Mr. Miskelly didn't make any comments in any regard regarding anything that might keep [him] from being hired. Nothing whatsoever." (Summers Dep. at 132.) When questioned by the Plaintiff as to why he was not hired, Jackson advised that the better candidate had received the position. (Jackson Dep. at 54, 81-82.) Summers was unaware of the qualifications of other applicants. (Summers Dep. at 123-24.)

## *ARGUMENTS OF THE PARTIES AND ANALYSIS*

The ADEA makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). The purpose of the Tennessee legislature in passing the THRA was, in part, to "[p]rovide for execution within Tennessee of the policies embodied in the federal . . . Age Discrimination in Employment Act of 1967, as amended." Tenn. Code Ann. § 4-21-101(a)(1).

"The ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination." Schoonmaker v. Spartan Graphics Leasing, LLC, ___ F.3d ___, 2010 WL 364185, at *2 (6th Cir. Feb. 3, 2010) (quoting Geiger v. Tower Auto., 579 F.3d 614, 620 (6th Cir. 2009)). The plaintiff retains the ultimate burden of proving that "age was the 'but-for' cause of their employer's adverse action." Geiger, 579 F.3d at 620 (quoting Gross v. FBL Fin. Servs., Inc., ___ U.S. ___, 129 S. Ct.

2343, 2351 n.4, 174 L. Ed. 2d 119 (2009)).  That is, "[t]o establish a disparate-treatment claim under the plain language of the ADEA, . . . a plaintiff must prove that age was the 'but-for' cause of the employer's adverse decision."  Gross, 129 S. Ct. at 2350.  Such proof must be by a preponderance of the evidence.  Id. at 2351.

A violation of the ADEA may be shown by direct or circumstantial evidence.  Geiger, 579 F.3d at 620.  "Direct evidence of discrimination is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions."  Id. (quoting Wexler v. White's Fine Furniture, Inc., 317 F.3d 564, 570 (6th Cir. 2003) (en banc)).  "Circumstantial evidence, on the other hand, is proof that does not on its face establish discriminatory animus, but does allow a factfinder to draw a reasonable inference that discrimination occurred."  Id. (quoting Wexler, 317 F.3d at 570).  The Plaintiff in this case relies solely on circumstantial evidence.

To establish a prima facie case of age discrimination under both statutes[2] in the non selection context, a plaintiff must, following the burden-shifting paradigm articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05, 93 S. Ct. 1817, 1824-26, 36 L. Ed. 2d 668 (1973), and Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 256-59, 101 S. Ct. 1089, 1095-97, 67 L. Ed. 2d 207 (1981),[3] show that (1) he was at least forty years old at the time of the alleged

---

[2]The same analysis applies to such claims under the ADEA and the THRA.  Bender v. Hecht's Dep't Stores, 455 F.3d 612, 620 (6th Cir. 2006), *cert. denied*, 550 U.S. 904, 127 S. Ct. 2100, 167 L. Ed. 2d 814 (2007).

[3]In Gross, the Supreme Court expressly declined to decide whether the McDonnell Douglas test applies to the ADEA.  Gross, 129 S. Ct. at 2349 & n.2.  However, this Circuit has held that the McDonnell Douglas framework may still be used to analyze ADEA claims based on circumstantial evidence.  *See* Geiger, 579 F.3d at 622.

discrimination, (2) he applied for and was qualified for the position, (3) he was not selected for the position, and (4), after he was rejected, a substantially younger applicant was selected. Hedrick v. W. Reserve Care Sys., 355 F.3d 444, 459-60 (6th Cir.), *cert. denied*, 543 U.S. 817, 125 S. Ct. 68, 160 L. Ed. 2d 25 (2004). "Once the plaintiff makes this showing, the burden of production shifts to the defendant to articulate a nondiscriminatory reason for its action." Harris v. Metro. Gov't of Nashville & Davidson County, Tenn., ___ F.3d ___, 2010 WL 393374, at *7 (6th Cir. Feb. 5, 2010). If the employer satisfies its burden, the plaintiff must then demonstrate that the employer's proffered reason was a mere pretext for intentional age discrimination. Id. A plaintiff may establish pretexts by showing "that the proffered reasons (1) had no basis in fact, (2) did not actually motivate the employer's action, or (3) were insufficient to motivate the employer's action. A defendant's proffered reason cannot be proved to be a pretext unless it is shown *both* that the reason was false, *and* that discrimination . . . was the real reason." Id. at *8 (internal citations and quotation marks omitted) (emphasis in original).

The Defendant does not argue that the Summers has failed to establish a prima facie case of age discrimination and, indeed, the Court finds that he has done so. He is more than forty years of age (Summers Dep. at 8), he was not hired for a teaching position (Miskelly Dep. at 33), he was qualified to teach (Miskelly Dep. at 34-38, 43-44), and the Defendant hired substantially younger individuals to fill the positions denied to Summers (Miskelly Dep. at 75-78). In addition, the Plaintiff does not contest, and the Court concludes, that the Board has produced a legitimate, nondiscriminatory reason for its decision, which it has identified as the Plaintiff's "controversial reputation."

Summers maintains in his response to the instant motion that the Board's proffered reason was pretextual based on (1) Miskelly's questions concerning his age and how long he intended to continue teaching and (2) Miskelly's lack of information regarding his reputation. As to the first, it has been held that such inquiries are not evidence of age discrimination. *See* E.E.O.C. v. Delta Chem. Corp., Civil No. JFM 07-2572, 2008 WL 4833098, at *5 (D. Md. Nov. 3, 2008) (citing Shorette v. Rite Aid of Me., Inc., 155 F.3d 8, 13 (1st Cir. 1998)) (question by employer about an applicant's age and retirement plans is "a textbook example of an isolated remark which demonstrates nothing").

With respect to the latter, the Plaintiff appears to suggest that Miskelly's knowledge of his employment history is so vague that a reasonable factfinder could discredit the nondiscriminatory reason presented by the Board. However, in the Court's view, Miskelly's testimony on the subject is not quite as imprecise as Summers suggests, to wit:

> A: . . . I think the ability to exercise good judgment is -- when you know when not to tread on controversial issues or to do things that can cause controversy in a school system.
>
> Q: And why do you believe that Mr. Summers would not know that or did not know that?
>
> A: I'm not sure except to say that I had heard and been informed and -- that he had been involved in controversial issues in his past.
>
> Q: Who informed you of that?
>
> A: I can't specifically say who informed me. One of the things that, again, as Director of Schools in making the call on people who will be employed is to try to know as many people as possible when they make application and they come through your doors -- you know, all the checks and balances in placing people because that is a very important decision. And, so, as I began to listen and look, it just became obvious that Mr. Summers had done controversial or made controversial statements in the past.

Q: Well, what led you to believe that? I mean what specific information did you receive that he had done this?

A: Well, first of all I had -- my background is in Mississippi, and I had talked to some people that had worked in the Alcorn School System where Mr. Summers had been a substitute. And they indicated that Mr. Summers would not be substituting back at Kossuth School because of the controversial issues.

Q: Who told you that?

A: I know a lot of people there, and I'm not sure that there's a particular name. But again, as I discussed Mr. Summers there -- I know a lot of people at that school because I taught there for a long time. So, I don't know in particular who that would have been.

Q: You can't identify any individual who said this to you?

A: Who said it to me?

Q: Yeah. Who told you that Mr. --

A: I can't give you a name. No, sir.

Q: No indication at all who would have said this to you that kept you from considering Mr. Summers for a position with your school system?

A: But then as I talked and began to listen more, there were people in McNairy County that began to express concern about Mr. Summers. And, again, you know --

(Miskelly Dep. at 40-42.)

Q: All right. What -- you can't identify anybody who said anything to you in the Kossuth School. Is that correct?

A: I don't remember particularly any one person who made that statement.

Q: Okay. And was it a principal, a superintendent, a teacher?

A: I believe it was teachers and officer personnel.

Q: Can you tell me the name of one teacher?

9

> A: No, I cannot.
>
> Q: And what had he done that was so -- that was controversial?
>
> A: Well, what I was told was that he had again talked and taught about religion and evolution.
>
> Q: Do you know what he had said about religion and evolution?
>
> A: I don't know the particular comments that he made. No.

(Miskelly Dep. at 45.)

> Q: And do you know specifically what Mr. Summers was alleged to have taught his class in Kossuth?
>
> A: Specifically?
>
> Q: Yes.
>
> A: No, sir.
>
> Q: You just know it had something to do with evolution?
>
> A: I know it was controversial.
>
> Q: And how do you know it was controversial?
>
> A: Because Mr. Summers was not asked to come back to be a substitute teacher there.
>
> Q: And who told you that?
>
> A: Somebody at Kossuth High School.
>
> Q: But you can't identify that person?
>
> A: I can't.
>
> Q: And you can't tell me if it was a principal.
>
> A: I don't believe it was a principal.
>
> Q: That would have been a good person to ask, wouldn't it?

A: The principal would probably know if a teacher -- a substitute teacher was being prohibited from coming back to the school, wouldn't you think, probably?

Q: You're asking me?

A: Yeah. Yeah.

Q: He probably would know.

*   *   *

A: I would expect that [McNairy County teachers] would make a comment but not to make a judgment or to condemn one religion or start talking about religion versus evolution or anything of that nature.

Q: But you don't know if Mr. Summers did that, do you?

A: I do know that it was controversial whatever he did.

Q: But you don't know any specifics about that?

A: I don't know specifically.

Q: And that is the sole reason you assert that Mr. Summers would not ever have made it to the long list of teachers whom you would have considered for a position. Is that correct?

A: Well, again, I think there has been a history of controversial issues with Mr. Summers -- not ---

Q: All right. Well, let me. You've mentioned Kossuth School. What else is included in this history of controversial issues?

A: Well, again, comments that he has made as far back as the '70s allegedly about religion and evolution in the McNAIRY County Schools.

Q: And what information do you have about comments he made in the '70s about religion and evolution?

A: Similar. That -- just that he was involved in comments with students about religion and evolution.

Q: Do you know any specifics?

11

> A: I do not.
>
> Q: Where did you get that knowledge?
>
> A: Just from the community.
>
> Q: Who in the community told you this?
>
> A: Again, I don't remember specifically someone just coming up and saying -- but, again, my job is to screen and review applicants as they appear in my office.
>
> Q: But you cannot identify any person who told you that?
>
> A: No.
>
> Q: What else is included in this history of controversy about Mr. Summers as a teacher?
>
> A: I would say that would probably be the Number One issue or the only issue that I have heard. Again, the judgment to -- what conversations you get involved in with the students when you are teaching them and they are in your jurisdiction.
>
> Q: But that's it? You mentioned -- you said something about the history, and we've talked about Kossuth School. We've talked about allegations from the '70s about comments about religion and evolution. And I just want to make sure that there's nothing else that you have that goes into this history with him being a controversial teacher.
>
> A: Not that I can think of right now.

(Miskelly Dep. at 50-55.)

> A: . . . the people of McNairy County and that people at Kossuth considered Mr. Summers controversial.

(Miskelly Dep. at 57.)

The Plaintiff has clearly not shown that the legitimate, nondiscriminatory reason had no basis in fact, as he has essentially conceded that everything Miskelly heard was true. Nor has he demonstrated that his reputation was not the actual or a sufficient motivation for the Board's failure

to hire him to teach in McNairy County. Whether he thought it justified or not, Summers had developed a reputation in school systems in this area over a long period of time for being something of a troublemaker by discussing controversial matters, or at least topics uncomfortable for the administration, in the classroom. While he may not have known the details, Miskelly was aware of that reputation. The Board made a business decision to minimize any potential risks by hiring another applicant. "[I]t is inappropriate for the judiciary to substitute its judgment for that of management[; r]ather, [the Court's] inquiry is limited to whether the employer gave an honest explanation of its behavior" which was not discriminatory on the basis of age. Hedrick, 355 F.3d at 462 (internal citations omitted). As the Plaintiff has failed to show the reason offered by the Defendant was pretextual, his ADEA and THRA age discrimination claims cannot survive summary judgment. *See* Harris, 2010 WL 393374, at *7 (setting forth pretext as necessary element of age discrimination claim).

## *CONCLUSION*

For the reasons articulated herein, the Defendant's motion for summary judgment is GRANTED and this matter is DISMISSED in its entirety.

IT IS SO ORDERED this 16th day of February 2010.

          s/ J. DANIEL BREEN
          UNITED STATES DISTRICT JUDGE